| | |
|---|---|
| DEBORAH DUGAN, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| vs. | ) Civil Action No. 07-1639 |
| | ) |
| MICHAEL J. ASTRUE, | ) |
| Commissioner of Social Security, | ) |
| | ) |
| Defendant. | ) |

## MEMORANDUM OPINION

### I.   INTRODUCTION

Pending before the Court are cross-motions for summary
judgment filed by Plaintiff Deborah Dugan and Defendant Michael J.
Astrue, Commissioner of Social Security.  Plaintiff seeks review of
a final decision by the Commissioner denying her claim for
supplemental security income benefits ("SSI") under Title XVI of
the Social Security Act, 42 U.S.C. §§ 1381 *et seq*.  For the reasons
discussed below, Plaintiff's motion is denied and Defendant's
motion is granted.

### II.  BACKGROUND

#### A.   Factual Background

Deborah Dugan dropped out of high school after the ninth
grade and received a GED in about 1996.  (Certified Copy of
Transcript   of   Proceedings   before   the   Social   Security
Administration, Docket No. 5, "Tr.," at 54, 239.)   In 1998,

Plaintiff was diagnosed with hepatitis C[1] which was discovered during the course of attempting to donate blood; however, she was not treated for the condition at that time. (Tr. 153.)

Between 2000 and 2005, Ms. Dugan worked at a variety of jobs, primarily as a housekeeper, but with some short periods working at a motel and as a home health aide. (Tr. 54-55.) In February 2005, Ms. Dugan quit her job cleaning private homes, later explaining that she could not do that type of work any longer due to fatigue. (Tr. 84-85.) After she experienced leg cramps, nausea and vomiting, she sought medical assistance. (Tr. 153-154.) In August 2005, the diagnosis of mild chronic active hepatitis C was confirmed (Tr. 145-146) and in October 2005, she began chemotherapy (Tr. 157-158.) Ms. Dugan reported in March 2006 that she developed flu-like symptoms and became "very sick" from the chemotherapy. (Tr. 75, 79.)

She also stated that in January 2006, she began treatment with Dr. Leyla Somen, a psychiatrist at Turtle Creek Valley Mental Health Services ("Turtle Creek Mental Health"), for anxiety and

---

[1] Hepatitis C is an inflammation of the liver caused by a viral infection. Many people who are infected with hepatitis C do not have symptoms and it is often detected during blood tests for a routine physical or other medical procedures. Although it is incurable, some patients benefit from treatment with interferon alpha injections or a combination of interferon alpha and ribavirin; each treatment has numerous serious side effects. At least 80% of patients with acute hepatitis C ultimately develop chronic liver infection, 20% to 30% develop cirrhosis, and between 1% and 5% may develop liver cancer. *See* the medical encyclopedia at the National Institute of Medicine's on-line website, www.nlm.nih.gov/medlineplus (last visited October 3, 2008), "MedlinePlus."

depression which had been exacerbated by the chemotherapy. (Tr. 74, 242.)

B.  Procedural Background

On September 22, 2005, Ms. Dugan applied for supplemental security income benefits, claiming disability beginning February 5, 2005, due to hepatitis C and depression. (Tr. 48, 25.) After her application was initially denied on January 26, 2006 (Tr. 25-29), Plaintiff timely requested a hearing before an Administrative Law Judge ("ALJ.")

On August 29, 2006, a hearing was held before the Honorable William E. Kenworthy at which Plaintiff was represented by counsel; William H. Reed, Ph.D., a vocational expert ("VE"), also testified. Judge Kenworthy issued his decision on September 7, 2006, again denying benefits. (Tr. 12-19.) The Social Security Appeals Council declined to review the ALJ's decision on November 9, 2006, finding no reason pursuant to its rules to do so. (Tr. 4-6.) Therefore, the September 7, 2006 opinion became the final decision of the Commissioner for purposes of review. 42 U.S.C. § 405(h); Rutherford v. Barnhart, 399 F.3d 546, 549-550 (3d Cir. 2005), citing Sims v. Apfel, 530 U.S. 103, 107 (2000). Plaintiff filed suit in this Court on November 30, 2007, seeking judicial review of the ALJ's decision.

III.  JURISDICTION

This Court has jurisdiction by virtue of 42 U.S.C.

3

§ 1383(c)(3) (incorporating 42 U.S.C. § 405(g)) which provides that
an individual may obtain judicial review of any final decision of
the Commissioner by bringing a civil action in the district court
of the United States for the judicial district in which the
plaintiff resides.

## IV. STANDARD OF REVIEW

The scope of review by this Court is limited to determining
whether the Commissioner applied the correct legal standards and
whether the record, as a whole, contains substantial evidence to
support the Commissioner's findings of fact. 42 U.S.C. § 405(g);
Richardson v. Perales, 402 U.S. 389 (1971); Schaudeck v. Comm'r of
Soc. Sec. Admin., 181 F.3d 429, 431 (3d Cir. 1999). Findings of
fact by the Commissioner are considered conclusive if they are
supported by "substantial evidence," a standard which has been
described as requiring more than a "mere scintilla" of evidence,
that is, equivalent to "such relevant evidence as a reasonable mind
might accept as adequate to support a conclusion." Richardson, id.
at 401. "A single piece of evidence will not satisfy the
substantiality test if the [ALJ] ignores, or fails to resolve a
conflict, created by countervailing evidence." Kent v. Schweiker,
710 F.2d 110, 114 (3d Cir. 1983).

This Court does not undertake de novo review of the decision
and does not re-weigh the evidence presented to the Commissioner.
Schoengarth v. Barnhart, 416 F. Supp.2d 260, 265 (D. Del. 2006),

4

*citing* Monsour Medical Center v. Heckler, 806 F.2d 1185, 1190 (3d Cir. 1986) (the substantial evidence standard is deferential, including deference to inferences drawn from the facts if they, in turn, are supported by substantial evidence.) If the decision is supported by substantial evidence, the Court must affirm the decision, even if the record contains evidence which would support a contrary conclusion. Panetis v. Barnhart, CA No. 03-3416, 2004 U.S. App. LEXIS 8159, *3 (3d Cir. Apr. 26, 2004), *citing* Simmonds v. Heckler, 807 F.2d 54, 58 (3rd Cir. 1986), and Sykes v. Apfel, 228 F.3d 259, 262 (3rd Cir. 2000).

## V.   **LEGAL ANALYSIS**

### A.   The ALJ's Determination

In determining whether a claimant is eligible for supplemental security income benefits, the burden is on the claimant to show that she has a medically determinable physical or mental impairment (or combination of such impairments) which is so severe she is unable to pursue substantial gainful employment[2] currently existing in the national economy. The impairment must be one which is expected to result in death or to have lasted or be expected to last not less than twelve months.   42 U.S.C. § 1382c(a)(3)(C)(i); Morales v. Apfel, 225 F.3d 310, 315-316 (3d

---

[2]   According to 20 C.F.R. § 416.972, substantial employment is defined as "work activity that involves doing significant physical or mental activities." "Gainful work activity" is the kind of work activity usually done for pay or profit.

5

Cir. 2000). The claimant must also show that her income and financial resources are below a certain level. 42 U.S.C. § 1382(a).

To determine a claimant's rights to SSI,[3] the ALJ conducts a formal five-step evaluation:

(1) if the claimant is working or doing substantial gainful activity, she cannot be considered disabled;

(2) if the claimant does not suffer from a severe impairment or combination of impairments that significantly limits her ability to do basic work activity, she is not disabled;

(3) if the claimant does suffer from a severe impairment which meets or equals criteria for an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1 ("the Listings") and the condition has lasted or is expected to last continually for at least twelve months, the claimant is considered disabled;

(4) if the claimant retains sufficient residual functional capacity ("RFC") to perform her past relevant work, she is not disabled; and

(5) if, taking into account her RFC, age, education, and past work experience, the claimant can perform other work that exists in the local, regional or national economy, she is not disabled.

20 C.F.R. § 416.920(a)(4); see also Morales, 225 F.3d at 316.

In steps one, two, and four, the burden is on the claimant to present evidence to support his position that she is entitled to Social Security benefits, while in the fifth step the burden shifts

---

[3] The same test is used to determine disability for purposes of receiving either supplemental security income benefits or disability insurance benefits ("DIB.") Burns v. Barnhart, 312 F.3d 113, 119, n.1 (3d Cir. 2002). Therefore, courts routinely consider case law developed under both SSI and DIB programs.

to the Commissioner to show that the claimant is capable of performing work which is available in the national economy.[4]  <u>Sykes v. Apfel</u>, 228 F.3d 259, 263 (3d Cir. 2000).

Following the prescribed analysis, Judge Kenworthy first concluded that Ms. Dugan had not engaged in substantial gainful activity since her alleged disability onset date, February 5, 2005. (Tr. 14.)  Resolving step two in Plaintiff's favor, the ALJ found that her severe[5] impairments included hepatitis C, bipolar disorder, anxiety disorder, alcohol abuse, and drug addiction in early remission.  (<u>Id.</u>)  At step three, the ALJ concluded Ms. Dugan's medical conditions, either alone or in combination, did not meet or medically equal any of the listed impairments.  He specifically considered Plaintiff's bipolar disorder and panic disorder against Listings 12.04 (affective disorders) and 12.06 (anxiety related disorders.)  In this portion of his analysis, he further concluded that the medical evidence showed these

---

[4]  Step three involves a conclusive presumption based on the listings, therefore, neither party bears the burden of proof at that stage.  <u>Sykes</u>, 228 F.3d at 263, n2, *citing* <u>Bowen v. Yuckert</u>, 482 U.S. 137, 146-147 n.5 (1987).

[5]  *See* 20 C.F.R. §§ 404.1520(c), 404.1521(a), and 140.1521(b), stating that an impairment is severe only if it significantly limits the claimant's "physical ability to do basic work activities," i.e., "abilities and aptitudes necessary to do most jobs, including, for example, walking, standing, sitting, lifting, pushing, pulling, reaching, carrying or handling," as compared to "a slight abnormality" which has such a minimal effect that it would not be expected to interfere with the claimant's ability to work, regardless of his age, education, or work experience.  <u>Yuckert</u>, 482 U.S. at 149-151.  The claimant has the burden of showing that the impairment is severe.  <u>Id.</u> at 146, n.5.

7

impairments satisfied the "A criteria" of the relevant Listings, but there was no evidence to establish that the mental conditions were sufficiently severe to satisfy the "B criteria" or "C criteria" of the Listings.[6]  (Tr. 14-17.)  Moreover, although Ms.

---

[6]  The Social Security Administration has developed a special technique for reviewing evidence of mental disorder claims.  Listing 12.04 sets out three categories which measure the severity and effects of the claimant's impairment, commonly referred to as the A, B, and C criteria.  The A criteria require the claimant to show the medically documented persistence, either continuous or intermittent, of depressive syndrome marked by four of nine specific traits; manic syndrome with at least three of eight traits; or bipolar syndrome with both manic and depressive traits.  To satisfy the B criteria, the claimant's depressive, manic, or bipolar syndrome must be of such severity that it results in at least two of the following: "marked" (i.e., more than moderate but less than extreme) restrictions in activities of daily living; marked difficulties in maintaining social functioning; marked difficulties in maintaining concentration, persistence, or pace; or repeated episodes of decompensation, each of extended duration.  To satisfy the C criteria, the claimant must present medical evidence that his affective disorder has lasted at least two years, resulting in "more than a minimal limitation of ability to do basic work activities."  The symptoms or signs of the affective disorder must be currently attenuated by medication or psychosocial support.  The C criteria also require the claimant to show one of the following:  repeated episodes of decompensation, each of extended duration; a residual disease process resulting in such marginal adjustment that even minimal increases in mental demands or change in the environment would be predicted to cause the individual to decompensate; or a current history of one or more years' inability to function outside a highly supportive living arrangement and an indication of the continued need for such an arrangement.

The A and B criteria of Listing 12.06 are identical to those of Listing 12.04, while the C criterion is slightly different, requiring the claimant to show a "complete inability to function independently outside the area of one's home."

To meet Listing 12.04, the claimant must satisfy the A criteria plus two of the four B criteria, or, alternatively, satisfy the C criteria; to meet Listing 12.06, he must satisfy the A criteria and two of the four B criteria, or, alternatively, both the A and C criteria.

Plaintiff does not take issue with the ALJ's conclusion that Plaintiff's bipolar disorder, panic disorder, and alcohol dependence did not satisfy the relevant Listings, nor the conclusion that her mental and physical impairments, alone or in combination, were not medically equivalent to any Listing.  Therefore, we do not discuss the

8

Dugan had been diagnosed with hepatitis C, the medical evidence described her condition as "mild" and the disease had not resulted in the complications necessary to satisfy Listing 5.05 (chronic liver disease.) (Tr. 14, 17.)[7]

In the first part of step four, the ALJ concluded Ms. Dugan had the residual functional capacity

> to perform tasks at the light exertional level, lifting up to 20 pounds occasionally, limited to simple repetitive tasks that do not require dealing with the general public or close interaction and cooperation with supervisors or coworkers. The work should not be characterized by strict production quotas or similar sources of a high-level of work stress.

(Tr. 17.)

In arriving at this description of Plaintiff's residual functional capacity, Judge Kenworthy specifically considered Plaintiff's non-exertional limitations and subjective symptoms, particularly her bipolar disorder and the fatigue associated with hepatitis C. (Tr. 17-18.) The ALJ concluded that although these medically determinable impairments could reasonably be expected to

ALJ's mental impairment analyses in detail.

[7] The ALJ did not specifically refer to Listing 5.05 in his opinion, but it is clear from the discussion of the pertinent medical evidence (Tr. 14) that this is Listing he considered. *See* Cosby v. Comm'r of Soc. Sec., No. 06-3157, 2007 U.S. App. LEXIS 10267, *19 (3d Cir. May 1, 2007), declining to remand where the ALJ's methodical analysis of (1) the claimant's limitations vis-a-vis the relevant criteria, (2) the medical and non-medical evidence, and (3) the claimant's testimony, taken as a whole, allowed meaningful review of his conclusion at step three, even in the absence of reference to a specific listing. Plaintiff raises no arguments with regard to this omission by the ALJ and, again, the Court will not address the medical evidence pertaining to hepatitis C except in passing.

9

produce the symptoms described by Ms. Dugan, her statements regarding the intensity, persistence, and limiting effects thereof were not entirely credible. (Tr. 18.)

Also at step four, the ALJ concluded Plaintiff could perform her past relevant work as housekeeper in a private home or hotel, which Dr. Reed had described as light, unskilled work. (Tr. 19; see also Tr. 251-252.) In response to the ALJ's hypothetical questions at the hearing, the Vocational Expert also testified that there were other unskilled, light jobs which an individual of Ms. Dugan's education, experience, and non-exertional limitations could perform in the local or national economy; he provided the examples of vehicle washer, equipment cleaner, and photocopier operator, limiting the last to non-commercial environments to minimize contact with the public. (Tr. 251-252.) Inasmuch as Plaintiff could return to her prior work as a housekeeper/cleaner as the job is generally performed in the national economy, the ALJ concluded at step four that Ms. Dugan had not been under a disability as defined in the Social Security Act at any time between the benefits application date and the date of his opinion and was therefore not entitled to benefits. (Tr. 19.)

B. Plaintiff's Arguments

Plaintiff raises two arguments in support of her motion for summary judgment. First, she contends the ALJ failed to discuss the evidence provided by Plaintiff's treating psychiatrist,

10

Dr. Somen, which indicated Ms. Dugan was seriously impaired in her ability to function in a work setting. This complete omission makes it impossible for the Court to know if the ALJ considered Dr. Somen's opinions and rejected them or simply ignored this evidence. Therefore, remand is necessary for further explanation by the ALJ of his reasoning on this point. (Plaintiff's Brief in Support of Motion for Summary Judgment, Docket No. 8, "Plf.'s Brief," at 7-13.) Second, the hypothetical questions posed to the Vocational Expert did not adequately and accurately incorporate all of Ms. Dugan's work-related limitations, in particular her inability to maintain attendance on a regular and consistent basis. This error again requires remand for further consideration by the ALJ. (Id. at 14-16.)

We are unpersuaded by either of Plaintiff's arguments. We begin our analysis by summarizing the medical evidence pertaining to Plaintiff's mental impairments in chronological order, followed by her own statements on this issue.

    1. *Medical Evidence:* On February 25, 2003, Plaintiff was admitted to the emergency room of a hospital in Braddock, Pennsylvania, after she ingested alcohol and 10 tablets of an anti-depressant medication she had taken from her sister; toxicology screens performed on admission showed the presence of cocaine as well. She was involuntarily committed to the hospital's psychiatric unit where she remained for eight days. During a

11

psychiatric consultation on February 26, 2003, Ms. Dugan reported
that she had felt increasingly depressed for an unspecified period
of time, with poor appetite, sleep disturbance, fatigue, low
energy, decreased interests, negative thoughts, lack of motivation
and generally feeling "sad and blue." She described her overdose
as an impulsive act committed after she had been drinking all day;
she had recently lost her job as a housekeeper, had no money and no
medical insurance, was unable to keep her apartment, and was
worried about her daughter. She also told staff that although she
had ongoing anxiety and panic attacks, she had never received any
treatment for these conditions. The psychiatrist who conducted the
consultative examination, Dr. John Guterson, noted Plaintiff's flat
affect, little or no eye contact, depression, but found no suicidal
or homicidal ideation and no psychotic symptoms. She was vague and
uncooperative during the interview. Although she demonstrated
poverty of speech and her insight and judgment were described as
impaired, Dr. Guterson described her thoughts as organized and goal
directed and her memory as intact. He diagnosed her with major
depressive disorder, single episode, severe without psychotic
features, and with alcohol abuse. Her GAF score[8] at the time was

---

[8] The Global Assessment of Functioning ("GAF") scale assesses
how well an individual can function according to psychological,
social, and occupational parameters, with the lowest scores assigned
to individuals who are unable care for themselves. Drejka v.
Barnhart, CA No. 01-587, 2002 U.S. Dist. LEXIS 7802, *5, n.2 (D. Del.
Apr. 18, 2002). A GAF rating between 31 and 40 reflects "some
impairment in reality testing or communication (e.g., speech is at
times illogical, obscure or irrelevant) OR major impairment in several

40. (Tr. 107-109.) Upon release on March 5, 2003, an appointment was arranged for Ms. Dugan to follow up with Turtle Creek Mental Health the following day (Tr. 106), but there is no evidence that she did so.

Her next treatment for mental impairments began on November 6, 2005, when she voluntarily went to Turtle Creek Mental Health, reporting that her anxiety had increased during the previous four months. Ms. Dugan stated she did not remember when she did not have anxiety and had been depressed for the past 15 years. She reported panic attacks, being uncomfortable around people, mood swings, not wanting to leave the house or get out of bed, increased sleep, poor concentration, and feeling hopeless, helpless, unworthy, and unmotivated. She also reported having periods when she had too much energy, was unable to sleep, and took on major projects such as painting the house. (Tr. 208, 214.) She admitted she had used alcohol and cocaine for several years, but stated she had stopped using both in about August 2005. (Tr. 216-217.) Ms. Dugan was diagnosed with bipolar disorder, most recent episode depression, mild; panic disorder with agoraphobia; and alcohol dependence in early remission. Her GAF score at the time was 50, indicative of serious mental symptoms or serious impairment in social or occupational functioning. (Tr. 219.) It was recommended

areas such as work. . ., family relations, judgment, thinking, or mood." *See* the on-line version of DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS, Multiaxial Assessment, American Psychiatric Association (2002), at www.lexis.com., last visited October 2, 2008.

13

that Plaintiff begin bi-weekly individual therapy with Angela Hauck, a licensed social worker. (Tr. 220.)

Dr. Somen conducted a psychiatric evaluation on January 19, 2006. (Tr. 204-207.) Ms. Dugan reported anxiety, panic, and depression that "comes and goes" in addition to fatigue due to hepatitis. (Tr. 204.) During the interview, Dr. Somen noted that her affect was flat, she could not describe her feelings, she mumbled, and appeared "very preoccupied" and confused. Dr. Somen also noted, "[S]he looked like she is under the influence of something [which] she denied. [S]he is vague and confuzed concelling??" (Tr. 206, sic.) Dr. Somen did not disagree with or modify the diagnosis of November 6, 2005, by Ms. Hauck, and prescribed effexor.[9]

Dr. Somen conducted medication checks on June 22 and July 20, 2006. On June 22, Dr. Somen noted this was the first check since January; Plaintiff's affect was described as flat and mentally slow, she used poor vocabulary, was "not articulate at all," had poor insight to her problem, was unmotivated, and had made no

---

[9]  Effexor (venlafaxine) is used to treat depression and, in its extended-release form, to treat generalized anxiety disorder, social anxiety disorder, and panic disorder. Venlafaxine is one of several selective serotonin and norepinephrine reuptake inhibitors which work by increasing the amounts of serotonin and norepinephrine, natural substances in the brain that help maintain mental balance. See drugs and supplements entry at Medline Plus.

14

progress. Dr. Somen prescribed lexapro and abilify,[10] apparently in place of effexor. (Tr. 232-234.) At the second medication check, Ms. Dugan was described as having a flat, dull affect with poor insight and judgment; her progress was described as "mild." She had improperly taken twice the dosage of abilify which had been prescribed on her last visit. (Tr. 229-231.)

Finally, on December 21, 2005, Plaintiff underwent a one-time consultative mental examination by Stephen Perconte, Ph.D. Dr. Perconte reviewed medical records provided by the Pennsylvania Bureau of Disability Determination, interviewed Ms. Dugan, and administered the Mini-Mental State Exam ("MMSE.") Ms. Dugan reported that she was receiving therapy at Turtle Creek Mental Health, but admitted she had missed her last appointment scheduled for November 22, 2005,[11] and had not yet seen Dr. Somen. (Tr. 176-178.) Her primary complaint to Dr. Perconte was anxiety attacks which caused nervousness, sweating, and rapid heartbeat. She

---

[10] Lexapro (escitalopram) is used to treat depression and generalized anxiety disorder. It is one of several antidepressants called selective serotonin reuptake inhibitors which work by increasing the amount of serotonin, a natural substance in the brain that helps maintain mental balance. Among other uses, abilify (aripiprazole) is used alone or with other medications to treat episodes of mania in patients with bipolar disorder and with antidepressants to treat depression when symptoms cannot be controlled by the antidepressant alone. Aripiprazole is in a class of medications called atypical antipsychotics which work by changing the activity of certain natural substances in the brain. See drugs and supplements entries at Medline Plus.

[11] The Court notes that if appointments were scheduled on a bi-weekly basis, this was probably the first appointment scheduled at the initial interview with Ms. Hauck on November 6, 2005.

15

explained that during these attacks, which occurred most often when she left home without her boyfriend, "I have to get out of wherever I am and it feels like they are closed in and you have to get out." (Tr. 179.) She also reported life-long mood swings, ranging from periods when she did not "know how to make it through the day," to others when she did not know what to do "with all the energy." (Id.) Dr. Perconte described her orientation as marginal and stated that she "did not appear to fully understand the purposes of the evaluation." She appeared vegetative, lethargic, apathetic, withdrawn, detached and resistant. Her eye contact was fair; her speech was soft, significantly slow, with below average fluency and unproductive (although relevant and coherent) content. He found her thought process "to be somewhat confused and rather concrete, without evidence of significant cognitive impairment." Insight and judgment were described as poor.

Ms. Dugan's score of 20 out of 30 on the MMSE was "significantly below the average score for her age and education level, and . . . below the cutoff for her diagnosis of cognitive dysfunction." Her performance was described as

notably erratic and rather inconsistent with the rest of the psychological interview. There is evidence to suggest that the claimant's poor performance was somewhat deliberate, and an attempt to portray herself as much more dysfunctional [than] she appeared to be throughout the remainder of the interview and evaluation. . . . There is no other evidence to suggest severe memory problems consistent with this performance, and these results appear attributable to either lack of effort or deliberate misrepresentation of her dysfunction.

16

(Tr. 180-181.)

Dr. Perconte specifically noted that when Plaintiff was asked to perform the serial 7's test, rather than subtracting seven from 100 several times, she appeared to subtract two numbers randomly or actually add numbers. But, conversely, she performed well on the computational component of the MMSE, for example, solving simple multiplication problems without error. (Tr. 181.) Dr. Perconte summarized as follows:

> The claimant reports symptoms of anxiety and depression, but it is difficult to separate this out from her history of drug and substance abuse. Despite her complaints of anxiety, the claimant has not sought treatment for several years until her recent application for treatment at Turtle Creek Valley Mental Health. The claimant has not yet been seen by a psychiatrist. The claimant's failure to avail herself of psychiatric or psychological treatment prior to approximately two months ago, as well as her exaggerated symptom presentation and what appears to be deliberate misrepresentation of her functioning on the Mental Status Exam is highly suggestive of malingering. The claimant's performance on the Mini-Mental State Exam was entirely inconsistent with her interview performance. Overall, while the claimant may have some anxiety-related symptomatology, as well as some reports of cycling moods with significant up and down periods [she] also appears to be misrepresenting [her] symptomatology and appears to be clearly malingering on her performance on the Mini-Mental State Exam.

(Tr. 182.)

Dr. Perconte also concluded that Ms. Dugan showed "at most mild overall impairment in her capacity to understand, retain and follow instructions" despite her claims of moderate to severe memory impairment. Comprehension appeared to be impaired at times, perhaps due in part to low average intellectual functioning and a

17

poor general fund of information, reflecting her limited education. She was further impaired by "characterological problems, poor motivation and possible concentration difficulties." Her ability to sustain attention and perform simple repetitive tasks was also only mildly impaired, but again affected by "poor motivation to the point of oppositional behavior and lack of effort." Her capacity to relate to others was affected by her reported panic attacks and her social skills appeared to be poor, with below average communication skills and self-reported high social anxiety. Her capacity to tolerate stress was low as were her coping skills (reflected by her use of alcohol to control anxiety), her impulse control, and below average judgment in most areas. (Tr. 183.) His diagnostic impression was rule out bipolar II disorder; alcohol dependence, by history, current use unknown; rule out malingering; and anti-social personality disorder. Her current and lowest GAF scores for the past year were estimated at 45, with the highest score estimated at 60. Dr. Perconte concluded her overall prognosis would be poor due to failure to comply with past treatment recommendations, chronic alcohol abuse, minimal socialization and poor motivation. (Tr. 184.)

2. *Plaintiff's Testimony and Non-Medical Evidence:* At the hearing, Plaintiff testified that after she began interferon treatments for hepatitis C in October 2005, she developed "bad depression" to the extent that her medical treatment was ended

18

earlier than expected, that is, after only seven months. (Tr. 242-243.) She further testified that she saw a mental health therapist weekly and Dr. Somen once a month. (Tr. 243.) She stated that she did not think she could work due to depression, anxiety, difficulty being outdoors, and panic attacks. (Tr. 244.) Upon questioning by her attorney, Ms. Dugan explained that she had seven-to-ten day periods of depression "every couple of weeks," and that when she was depressed, she could not do anything, could not concentrate, missed appointments, had trouble with motivation, had erratic sleep patterns, and was unable to do housework. (Tr. 247-248.) She testified she still had suicidal thoughts and periods of crying spells, despite changes in her medication. (Tr. 248, 250.)

In a questionnaire concerning Ms. Dugan's activities of daily living which she completed in November 2005, Plaintiff stated she did not drive because of panic attacks. She was able to care for her personal needs, cook, and grocery shop (but did not carry bags of groceries.) She could do some housecleaning although she needed to stop and rest and might not finish everything in a single day. (Tr. 57.) She was able to perform some but not all functions that involved concentration and thinking, e.g., she could plan her day (although sometimes "things end up getting switched around"), but had difficulty completing projects such as working puzzles and reading books. (Tr. 59-60.) She reported no difficulty getting along with family, friends, neighbors, and persons in authority,

19

although she did not respond well to criticism and often had panic attacks in public. (Tr. 60.) She stated she had trouble understanding instructions or carrying them out and did not cope well with change or personal disagreements. On the other hand, she could make decisions independently and take medications without assistance. (Tr. 61.) When she had worked in the past, she was able to report to work on time and had good attendance, but was not able to "keep up anymore," was not able to concentrate on her work for extended periods of time, and was not able to accept changes in the work place. (Tr. 61-62.)

3. *Failure to Consider Plaintiff's GAF Scores:* Returning to the arguments regarding the ALJ's treatment of the medical evidence, Ms. Dugan contends that her treating psychiatrist, Dr. Somen,

> opined that [she] was disabled. This is evidenced by Dr. Somen's consistent rating of Plaintiff's functioning at a GAF score level of 50, indicating a serious impairment in her ability to function in a work setting. The ALJ did not discuss Dr. Somen's treating records at all, except to note their existence, never discussed the GAF scores, or the fact that [Dr. Somen's] opinion was consistent with [Dr. Perconte's] conclusions.

(Plf.'s Brief at 7.)

Plaintiff argues that Dr. Somen "repeatedly concluded" that her ability to work was "seriously" impaired, as reflected by GAF scores of 50 on November 8, 2005, January 19, 2006, July 20, 2006,

20

and August 22, 2006.[12] (Plf.'s Brief at 8.) Plaintiff also argues this opinion by Dr. Somen should have been given increased weight because it is consistent with Dr. Perconte's finding of a GAF score of 45. (Id. at 9-10.)

We note initially that the Social Security Administration has explicitly declined to endorse use of the GAF scale because its scores do not have a direct correlation to the disability requirements and standards of the Act. See Fortney v. Astrue, CA No. 07-236, 2008 U.S. Dist. LEXIS 75034, *8 (W.D. Pa. Sept. 29, 2008), citing "Revised Medical Criteria for Evaluating Mental Disorders and Traumatic Brain Injury," 65 Fed. Reg. 50746 (August 21, 2000); see also Colon v. Barnhart, 424 F.Supp.2d 805, 812 (E.D. Pa. 2006). We further note that the GAF scores are the only evidence on which Plaintiff bases her argument that the ALJ erred in finding that she could perform her previous work. However, "neither the regulations nor case law requires an ALJ to determine a claimant's disability based solely on her GAF score." Ramos v. Barnhart, 513 F. Supp. 2d 249, 261 (E.D. Pa. 2007); see also Howard v. Comm'r of Soc. Sec., 276 F.3d 235, 241 (6th Cir. 2002) (the ALJ's failure to discuss the claimant's GAF scores, standing alone, was not a basis for remand because "[w]hile a GAF score may be of considerable help to the ALJ in formulating the RFC, it is

---

[12] We assume this reference to August 22, 2006, is a simple error because Plaintiff's reference to the transcript (Tr. 234) pertains to the medication check performed on June 22, 2006.

21

not essential to the RFC's accuracy.")

Second, as noted above, a GAF score between 41 and 50 indicates "serious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) OR any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job)." Contrary to Plaintiff's argument, such a score does not *necessarily* mean "a serious impairment in her ability to function in a work setting." That is, a GAF score in this range may relate to factors unrelated to the ability to hold a job, for instance in this case, Plaintiff's prior suicide attempt and/or her long-term substance abuse. Thus, without an explanation by the psychiatrist or psychologist of why he or she assigned the GAF score of 50, the score itself, considered in isolation, does not indicate that Plaintiff could not work. *See* Lewis v. Comm'r of Soc. Sec., CA No. 07-274, 2008 U.S. Dist. LEXIS 67242, *34-*35 (W.D. Pa. Aug. 28, 2008); *see also* Seymore v. Apfel, No. 97-5068, 1997 U.S. App. LEXIS 34323, *5 (10th Cir. Dec. 8, 1997)("standing alone without further narrative explanation, the [GAF] rating of 45 does not evidence an impairment seriously interfering with claimant's ability to work.") Moreover, a score of 50 is generally considered borderline between moderate and serious symptoms. *See* Colon, 424 F. Supp.2d at 809 n.3. In fact, the United States Court of Appeals for the Third Circuit has noted that a GAF score of 50 is not dispositive as to a claimant's ability to work, inasmuch as

22

it indicates the person "could perform some substantial gainful activity." Hillman v. Barnhart, No. 02-1416, 2002 U.S. App. LEXIS 21344, *9, n.1 (3d Cir. Sept. 26, 2002).

Turning to the evidence in this case, we note that Dr. Somen never opined directly as to Ms. Dugan's ability to work or lack thereof. Had she done so, that opinion would not be accorded any special deference or weight because the finding of disability is a question reserved to the Commissioner. *See* Johnson v. Comm'r of Soc. Sec., 529 F.3d 198, 203, n.2 (3d Cir. 2008), citing § 404.1527(e(1) for the principle that conclusions of this kind, e.g., a "statement by a medical source that you are 'disabled' or 'unable to work' does not mean that we will determine that you are disabled;" such conclusions are reserved to the Commissioner "because they are administrative findings that are dispositive of a case; i.e., that would direct the determination or decision of disability." Second, the references to Plaintiff's GAF of 50 on January 19, June 22, and July 20, 2006, are simply reiterations of the score assigned by Ms. Hauck during the initial intake interview on November 8, 2005. That is, there is no evidence Dr. Somen either concurred with or disagreed with that rating.

Third, accepting for the sake of argument that Dr. Somen concurred in Ms. Hauck's GAF score, we conclude the ALJ did not err by failing to find her opinion entitled to significant weight inasmuch as her treatment of Ms. Dugan consisted of only three

brief (i.e., twenty minute) medication checks on three occasions over eight months. Opinions based on such minimal interaction do not reflect judgment based on "continuing observation of the patient's condition over a prolonged time." Compare Morris v. Barnhart, No. 03-1332, 2003 U.S. App. LEXIS 22054, *8 (3d Cir. Oct. 28, 2003) (opinion of physician who saw plaintiff on three or four occasions over two or three months is not entitled to any presumption of controlling weight.)

We also find Plaintiff is not precisely correct when she states that the ALJ did not discuss Dr. Somen's treating records at all, except to note their existence. The ALJ noted Ms. Dugan's treatment history at Turtle Creek Mental Health and referred to the content of Dr. Somen's notes at Tr. 15 (dates, diagnoses and medications); Tr. 16 (references in the medical record to anxiety in crowds and other public situations); and Tr. 17-18 (inconsistencies between her testimony and her mental health records.) Since the entire medical record of Plaintiff's treatment at Turtle Creek Mental Health for the period November 8, 2005 through July 20, 2006, consists of only 21 pages, we conclude the ALJ did not fail to adequately discuss those treatment records, particularly since many of those pages are entirely devoid of substantive content. (See, e.g., 207, 212-213, 218.)

We do agree that the ALJ entirely omitted any reference to Plaintiff's GAF scores of 50 assigned by Ms. Hauck on November 8,

2005, and of 45 assigned by Dr. Perconte on December 21, 2005. Numerous district courts in this Circuit, particularly in the Eastern District of Pennsylvania, have held that because GAF scores constitute medical evidence which is accepted and relied on by physicians, where an ALJ fails to discuss those scores or to explain why they have been discounted, remand is necessary. *See* Glover v. Astrue, CA No. 07-2601, 2008 U.S. Dist. LEXIS 14572, \*4 (E.D. Pa. Feb. 27, 2008), citing cases. On the other hand, the general rule is that "the ALJ is to consider the clinical findings contained in the narrative reports of medical sources, and is to weigh that evidence under the standards set forth in the regulations for evaluating medical opinion evidence, taking into account numerous factors including the opinion's supportability, consistency and specialization." Fortney, 2008 U.S. Dist. LEXIS 75034 at \*8, *citing* 20 C.F.R. §416.927(d).

Here, there is no question that the ALJ considered the content of the Turtle Creek Mental Health records along with those of Dr. Perconte. He gave substantial weight to the latter's opinions and summarized not only Dr. Perconte's report of Plaintiff's psychiatric history, the results of the MMSE, and the psychologist's opinions of her overall performance, but also discussed Dr. Perconte's suspicion that Plaintiff appeared to be misrepresenting her symptomatology and malingering during the interview. (Tr. 18.) An ALJ is charged with reviewing the entire

record and, if there is substantial evidence to support his conclusions, this Court may not re-weigh that evidence. *See* McGonigal v. Barnhart, No. 04-4718, 2005 U.S. App. LEXIS 21975, *4 (3d Cir. Oct. 11, 2005) (even in the face of an argument that the ALJ overlooked or improperly discounted certain evidence in his analysis, an appellate court may not re-weigh the evidence where the decision was based on other substantial evidence.) Therefore, we conclude that even if Judge Kenworthy had discussed the GAF scores in Dr. Somen's records, his decision to give controlling weight to Dr. Perconte's opinion was not erroneous.

4. *The Hypothetical Questions:* Plaintiff argues that the Vocational Expert's answers to the hypothetical questions posed to him by the ALJ do not constitute substantial evidence because the questions did not accurately set forth all of her specific work-related limitations of function described in the administrative record. These limitations include frequent depressed periods – sometimes as long as ten days – in which she does not leave the house, problems being outdoors, and the likelihood that if she were to attempt working, her attendance would be erratic. (Plf.'s Brief at 14-15.)

At the hearing Judge Kenworthy asked the following hypothetical question:

. . . we assume [an] individual with the claimant's age, education and work experience and assume that she would be capable of performing work at the light exertional level, lifting up to 20 lbs occasionally. And further

assume that she would be limited to the performance of simple, repetitive tasks that do not involve dealing with the general public, maintaining close interaction and cooperation with coworkers, dealing with the demands of a rapid production pace or similar sources of workplace stress, are there jobs that could be performed?

(Tr. 251.)

The VE responded that there were numerous light unskilled jobs with those criteria available in the economy, including vehicle washer, equipment cleaner, photo-copier operator in a non-commercial environment, and housekeeping/cleaner, which was the job which Ms. Dugan had last held. (Tr. 252.) In response to a follow-up question by Plaintiff's attorney, the VE indicated that a typical employer would expect regular attendance excluding "maybe five days vacation, a couple sick days, a couple major holidays" with total absences no more than one or two days a month, particularly in the beginning part of the employment period. (Tr. 252-253.) Moreover, employers would expect an employee to be productive at least 80% of time. (Tr. 253.)

The Court has carefully examined the entire medical record, including those portions which do not directly relate to Plaintiff's mental health treatment but which could possibly contain comments she made to other physicians about her inability to leave her home, 10-day long periods of depression, inability to be outdoors, etc. We have been unable to identify any such statements. In the initial interview at Turtle Creek Mental Health in November 2005, she stated that she did not remember a time when

27

she did not have anxiety, and that she had felt depressed for about 15 years, but the record is clear that she worked steadily for the period 2002 through early 2005, despite these conditions. She stated that her panic attacks, i.e., "feeling uncomfortable," occurred when she was "around lots of people," but there was no indication that she was unable to simply be outdoors. (Tr. 214.) She reported to Dr. Perconte a similar reluctance to go out of her home and to socialize (Tr. 179-180), but as noted above, his conclusions were (1) her symptoms of anxiety and depression were difficult to separate from her history of drug and substance abuse; (2) despite her complaints that these conditions had existed for many years, she never sought treatment until after she applied for Social Security benefits; and (3) this delay, coupled with her exaggerated symptom presentation and what appeared to be deliberate misrepresentations on the MMSE, were "highly suggestive of malingering. (Tr. 182.)

In short, the medical evidence does not support Ms. Dugan's reports of debilitating depression, anxiety and panic attacks; these limitations appear only in the record in Plaintiff's testimony and in her self-generated reports to Ms. Hauck and Dr. Perconte. Such subjective complaints cannot alone establish disability. Gantt v. Comm'r Soc. Sec., No.05-4655, 2006 U.S. App. LEXIS 27117, *6-*7 (3d Cir. Oct. 31, 2006), see also 20 C.F.R. § 404.929(a). While an ALJ must give great weight to a claimant's

28

subjective testimony regarding his inability to work, that rule applies only if the claimant's testimony is "supported by competent medical evidence." Melvin v. Comm'r of Soc. Sec., No. 05-4400, 2007 U.S. App. LEXIS 4825, *6-*7 (3d Cir. Feb. 28, 2007), *quoting* Schaudeck v. Commissioner of SSA, 181 F.3d 429, 433 (3d Cir. 1999). Plaintiff's subjective complaints were considered by the ALJ in his hypothetical question by limiting her to jobs which involved only simple repetitive tasks, no interaction with the general public, no close interaction or cooperation with co workers, and minimal workplace stress. As the Court of Appeals has recently explained, if "medically undisputed evidence of specific impairments [is] not included in a hypothetical question to a vocational expert, the expert's response is not considered substantial evidence." Burns v. Barnhart, 312 F.3d 113, 123 (3d Cir. 2002). This holding is consistent with the long-established rule that the hypothetical questions posed by the ALJ need only incorporate the limitations which are supported by evidence of record. Chrupcala v. Heckler, 829 F.2d 1269, 1276 (3d Cir. 1987); *see also* Rutherford v. Barnhart, 399 F.3d 546, 554 (3d Cir. 2005) (the ALJ is not required to submit to the vocational expert every impairment alleged by the claimant, but only those which have been medically and credibly established.) Because the ALJ's hypothetical questions did incorporate the limitations supported by the record, we find they were not improper.

Having considered Plaintiff's arguments, we find neither persuasive. Plaintiff's motion for summary judgment is therefore denied in its entirety. An appropriate order follows.

October ___7___, 2008

William L. Standish
United States District Judge